IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

JEFF SHORSHER,

      Plaintiff,

v.

BOSCH SECURITY SYSTEMS, INC.,

      Defendant.

## COMPLAINT

COMES NOW Plaintiff, Jeff Shorsher, by and through counsel, Cornish & Dell'Olio, P.C., and for his Complaint against the Defendant, Bosch Security Systems, Inc. states as follows:

### Introduction

1. This is an action brought against Bosch Security Systems, Inc. pursuant to the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*, as interpreted by 29 C.F.R. § 825, *et seq.*, for interference with Mr. Shorsher's rights under the FMLA, including his right to restoration and to notice as set forth in the statute and the regulations, and for disability discrimination and failure to accommodate in violation of his rights under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*

### Jurisdiction

2. Jurisdiction is proper in the U.S. District Court for the District of Colorado pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2).

1

## Venue

3. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b)(2) as the actions giving rise to this action occurred in the State of Colorado.

## Parties

4. Mr. Shorsher resides in Colorado Springs, Colorado.

5. Mr. Shorsher worked for Defendant Bosch Security Systems, Inc. in Colorado.

6. Mr. Shorsher is an "eligible employee" within the meaning of 29 U.S.C. § 2611(2) of the FMLA.

7. Bosch Security Systems, Inc. is an international company with offices across the United States.

8. Bosch Security Systems, Inc. ("Bosch") is an "employer" within the meaning of 29 U.S.C. § 2611(4) of the FMLA.

## Factual Allegations

9. Jeff Shorsher has extensive experience working with sound and communications systems.

10. Mr. Shorsher worked as a sound engineer and an engineer-in-charge in Hollywood and on A-list sports and entertainment programs, including internationally-broadcast awards shows and sitcoms.

11. In 2015, Mr. Shorsher went to work for Bosch as a Key Account Manager for the Western Region representing the RTS Intercom systems product line.

12. Mr. Shorsher was a remote employee of Bosch.

13. Mr. Shorsher worked for Bosch from Colorado Springs, Colorado.

14. One aspect of Mr. Shorsher's duties for Bosch included travel throughout his

region to make sales calls on customers.

15. Mr. Shorsher's work-related travel was done by car and airplane.

16. Other aspects of Mr. Shorsher's duties for Bosch did not include travel, but instead required Mr. Shorsher to perform office-based tasks from Colorado Springs, which among other things, included regular communications with customers via phone and email.

17. Mr. Shorsher was a successful account manager who met his sales quotas each year.

18. Mr. Shorsher suffers from diabetes, hypertension, and sleep apnea.

19. On July 3, 2017, Mr. Shorsher had a heart attack.

20. After suffering the heart attack, Mr. Shorsher underwent quadruple bypass surgery.

21. In the spring of 2018, Mr. Shorsher began to suffer symptoms of a cardiac condition.

22. Mr. Shorsher's diabetes, hypertension, and sleep apnea all affected his cardiac condition.

23. Mr. Shorsher's cardiac condition and his hypertension are impairments that substantially limit his circulatory and cardiovascular major bodily functions.

24. Mr. Shorsher's diabetes is an impairment that substantially limits his endocrine function.

25. Mr. Shorsher's sleep apnea is an impairment that substantially limits his major bodily function of breathing.

26. Mr. Shorsher's cardiac condition, hypertension, diabetes, and sleep apnea substantially limit his cardiovascular, circulatory, endocrine, and breathing major bodily

functions as compared to average member of the general population.

27. Mr. Shorsher's cardiac condition, hypertension, diabetes, and sleep apnea are disabilities with the meaning of the Americans with Disabilities Act.

28. After Mr. Shorsher began suffering the symptoms of the cardiac condition in the spring of 2018, his doctor recommended that he take some time away from work to wear a heart monitor so the underlying condition could be properly diagnosed.

29. After the medical leave to wear the heart monitor, Mr. Shorsher returned to work, but continued to suffer cardiac symptoms, including extremely high blood pressure.

30. In August 2018, Mr. Shorsher had three additional heart surgeries.

31. Following the August 2018 surgeries, Mr. Shorsher's doctor wrote a letter recommending that he be off work until February 21, 2019 so he could complete two A1C blood test cycles to properly diagnose and treat his cardiac condition.

32. The request for medical leave from August 2018 to February 2019 was a request for a reasonable accommodation under the Americans with Disabilities Act.

33. Mr. Shorsher informed his supervisor, Greg Compagnone, of the request for medical leave until February 2019.

34. Mr. Shorsher provided Bosch with a copy of the letter from his doctor requesting that Mr. Shorsher be granted medical leave until February 2019.

35. Bosch never communicated to Mr. Shorsher that the requested medical leave was denied.

36. Bosch never communicated to Mr. Shorsher that the requested medical leave was only granted to a date earlier than the February 2019 date requested by Mr. Shorsher's doctor.

37. After Bosch received the letter from Mr. Shorsher's doctor recommending the

medical leave until February 21, 2019 for diagnosis and treatment of the cardiac condition, Mr. Compagnone, told Mr. Shorsher to turn off his computer until he returned to work, to leave an outgoing voice mail message directing any callers to contact Mr. Compagnone, to stop using his work email, and to do no work at all.

38. Mr. Shorsher understood Mr. Compagnone's directives that Mr. Shorsher should turn off his computer and do no work to indicate that Bosch had granted Mr. Shorsher the requested medical leave.

39. Following Mr. Compagnone's directive to Mr. Shorsher to do no work until the conclusion of his medical leave, Bosch disabled Mr. Shorsher's access to the VPN.

40. By disabling Mr. Shorsher's access to the VPN, Bosch made it so that Mr. Shorsher could not access the company network, including his work email.

41. Mr. Shorsher understood Bosch's disabling of his access to the VPN to indicate that Bosch had granted Mr. Shorsher the requested medical leave.

42. Mr. Compagnone never spoke to or communicated with Mr. Shorsher again after the late August 2018 conversation when Mr. Compagnone directed Mr. Shorsher to stop working until he returned from medical leave.

43. After the August 2018 conversation with Mr. Compagnone about medical leave, Mr. Shorsher stopped working and went on medical leave for treatment of his disabilities.

44. After Mr. Shorsher went on medical leave in August 2018, he received correspondence from Bosch's third-party benefits administrator, MetLife, dated September 17, 2018 that contained information about a short-term disability claim and FMLA leave.

45. The September 17, 2018 correspondence from MetLife did not meet the FMLA requirements for an FMLA rights and responsibilities notice.

46. The September 17, 2018 correspondence from MetLife did not meet the FMLA requirements for an FMLA designation notice.

47. The September 17, 2018 correspondence from MetLife did not inform Mr. Shorsher of his right to restoration at the conclusion of his leave.

48. The September 17, 2018 correspondence from MetLife did not inform Mr. Shorsher of the full amount of his leave entitlement.

49. The September 17, 2018 correspondence from MetLife did not inform Mr. Shorsher of the date on which he would have used all available FMLA leave.

50. On or about November 22, 2018, Mr. Shorsher checked his bank account balance and discovered that he had not been paid for several pay periods.

51. At the time Mr. Shorhser learned that he had not been paid, he believed, based on his conversation with Mr. Compagnone in August, that he was still on medical leave from Bosch for treatment of his disabilities.

52. After learning that he had not been paid, Mr. Shorsher contacted Stephanie Sass in Bosch's Human Resources Department about his concerns about not being paid.

53. Ms. Sass informed Mr. Shorsher that this was a problem with the short term disability insurance that needed to be fixed, that Mr. Shorsher was on unexcused leave, and that Mr. Shorsher should return to work with a doctor's note clearing him to do so.

54. The call between Mr. Shorsher and Ms. Sass was the first time Mr. Shorsher learned that Bosch considered him to be on unexcused leave.

55. Within days of learning from Ms. Sass that there was a problem with his leave, Mr. Shorsher obtained a note from his doctor that once again confirmed his medical conditions and put Bosch on notice that he required leave as an accommodation.

56. Mr. Shorsher provided Bosch with a copy of the November 2018 letter from his doctor that once again confirmed his medical conditions and put Bosch on notice that he required leave as an accommodation.

57. Mr. Shorsher obtained the November 2018 note from his doctor and provided it to Bosch because of his desire to continue working for Bosch.

58. Bosch did not respond to Mr. Shorsher about the leave request in the November 2018 letter from his doctor.

59. In a December 10, 2018 letter, Bosch's third-party benefits administrator, MetLife, indicated its awareness that Mr. Shorsher had requested medical leave until February 2019 related to treatment of his medical conditions.

60. As of December 10, 2018, both Bosch and MetLife were aware that Mr. Shorsher required an accommodation to continue working.

61. After Ms. Shorsher received the December 10, 2018 letter from MetLife, he obtained a December 19, 2018 letter from his doctor that outlined his medical restrictions.

62. The December 19, 2018 letter indicates that Mr. Shorsher's doctor was requesting medical leave for Mr. Shorsher because he was unable to drive long distances or fly.

63. Although Mr. Shorsher could not drive long distances or fly in December 2018, there were numerous other functions of his job that he could perform with or without accommodation at that time.

64. Mr. Shorsher provided Bosch with a copy of the December 19, 2018 letter from his doctor.

65. Mr. Shorsher obtained the December 19, 2018 note from his doctor and provided it to Bosch because of his desire to continue working for Bosch.

66. Mr. Shorsher attempted to discuss his medical issues, his need for an accommodation, possible accommodations, and his desire to continue working for Bosch with Ms. Sass.

67. On December 21, 2018, Ms. Sass sent Mr. Shorsher a letter that informed him his employment was terminated for failing to return to work following the expiration of his FMLA leave.

68. Ms. Sass' letter to Mr. Shorsher makes it clear that she and Bosch understood that Mr. Shorsher had a disability and required a reasonable accommodation for that disability, yet the company did not discuss possible accommodations with Mr. Shorsher.

69. Ms. Sass' December 21, 2018 letter specifically states that Mr. Shorsher was discussing returning to work.

70. Ms. Sass' December 21, 2018 letter specifically states that Mr. Shorsher had requested an opportunity to discuss his medical issues with her.

71. Ms. Sass' December 21, 2018 letter states that Bosch is not aware of any accommodation that would facilitate Mr. Shorsher's return to work or ability to perform his job; however, Ms. Sass' denied Mr. Shorsher's requests to speak with her.

72. Ms. Sass refused to speak with Mr. Shorsher and wrote the following: "It is not appropriate for me to discuss your medical situation, unless you are requesting an accommodation under the ADA."

73. At the time Ms. Sass wrote the December 21, 2018 letter, she was aware of Mr. Shorsher's impairments.

74. At the time Ms. Sass wrote the December 21, 2018 letter, she was aware of the limitations Mr. Shorsher's impairments caused on his major life activities and major bodily

functions.

75. At the time Ms. Sass wrote the December 21, 2018 letter, she was aware that Mr. Shorsher's impairments and the limitations caused by those impairments impacted Mr. Shorsher's ability to perform the essential functions of his job with or without a reasonable accommodation.

76. At the time Ms. Sass wrote the December 21, 2018 letter, she was aware of Mr. Shorsher's desire to continue working for Bosch.

77. At the time Ms. Sass sent the December 21, 2018 terminating Mr. Shorsher's employment, Bosch was aware that Mr. Shorsher required reasonable accommodations in order to perform the essential functions of his job.

78. Despite Bosch's awareness of Mr. Shorsher's disabilities, his need for an accommodation, and his desire to continue working, Bosch never engaged in an interactive process with Mr. Shorsher to identify any possible reasonable accommodations for his disability.

79. No representative of Bosch ever discussed any potential reasonable accommodations with Mr. Shorsher.

80. No representative of Bosch ever engaged in any interactive process with Mr. Shorsher.

81. If Bosch had engaged in an interactive process with Mr. Shorsher, available reasonable accommodations would have been identified.

82. There were a number of potential accommodation available to Mr. Shorsher that would have enabled him to perform the essential functions of his job.

83. Potential accommodations for Mr. Shorsher's temporary inability to drive long distances or fly would have included: allowing Mr. Shorsher to conduct customer visits by

9

remote means, such as videoconferencing; temporarily reassigning the duties that were associated with travel; reassignment to a vacant position; continued medical leave; and many others.

84. Bosch's failure to accommodate Mr. Shorsher's disability resulted in the termination of his employment.

85. Bosch was aware as early as August 2018 that Mr. Shorsher had one or more disabilities and required reasonable accommodations to perform the essential functions of his job.

86. Rather than communicate with Mr. Shorsher about any potential accommodations, Bosch chose to not communicate with Mr. Shorsher at all.

87. Bosch misled Mr. Shorsher into believing that he had been granted medical leave from August 2018 until February 2019.

88. Prior to Mr. Shorsher's communication with Ms. Sass in late November 2018 after he discovered that he had not been paid, Bosch had never informed Mr. Shorsher that he was required to return to work before February 2019 or that his failure to return before February 2019 would result in termination.

89. Bosch never informed Mr. Shorsher of the amount of FMLA leave he had available at the time he began his leave in August 2018.

90. Bosch never informed Mr. Shorsher of the specific end-date of his medical leave, nor did Bosch ever inform Mr. Shorsher of the date on which he would have used all available FMLA leave.

91. Bosch's failure to provide the required FMLA notices denied Mr. Shorsher the knowledge of how much FMLA leave he had available, of when his FMLA leave would expire,

and of his right to restoration at the conclusion of his FMLA leave.

92. If Bosch would have provided Mr. Shorsher with the required information about the amount of leave he had available, the date on which his FMLA leave would expire, and his right to restoration, Mr. Shorsher would have worked with his doctor to plan a course of treatment that would have enabled him to return to work before his leave expired.

93. Despite his desire and ability to return to work, Mr. Shorsher was not reinstated to his position and was not permitted to return to work.

94. Because Mr. Shorsher took FMLA leave, he was entitled to restoration to his former position at the conclusion of his leave.

95. Bosch refused to reinstate Mr. Shorsher.

96. As a result of Bosch's failure to restore Mr. Shorsher to his position, he suffered significant financial loss.

97. As a result of Bosch's failure to accommodate Mr. Shorsher's disability, his employment was terminated, and he suffered economic and noneconomic losses and damages.

98. Mr. Shorsher's employment with Bosch was terminated because of his disability.

### First Cause of Action
**(Americans with Disabilities Act—Failure to Accommodate)**

99. Plaintiff realleges all prior paragraphs and incorporates them herein.

100. Plaintiff is a qualified individual with a disability, specifically a cardiac condition, hypertension, diabetes, and sleep apnea.

101. Plaintiff's cardiac condition, hypertension, diabetes, and sleep apnea substantially limit his cardiovascular, circulatory, endocrine, and breathing major bodily functions.

102. Plaintiff was qualified for his position.

103. Plaintiff was able to perform the essential functions of his job with or without

reasonable accommodations.

104. Plaintiff requested a reasonable accommodation, or alternatively, Defendant was aware of Plaintiff's need for a reasonable accommodation.

105. Defendant failed to engage in the interactive process with Plaintiff regarding any potential reasonable accommodations.

106. Defendant failed to provide Plaintiff with a reasonable accommodation at any time after his request for a reasonable accommodation or after Defendant was aware of Plaintiff's need for a reasonable accommodation.

107. There were reasonable accommodations available to Plaintiff that Defendant could have provided, including allowing Plaintiff to conduct customer visits by remote means, such as videoconferencing; temporarily reassigning the duties that were associated with travel; reassignment to a vacant position; continued medical leave; and many others.

108. Plaintiff's employment was terminated because Defendant failed to provide him with a reasonable accommodation.

109. Defendant's acts and omissions violated Plaintiff's rights under the Americans with Disabilities Act.

110. Defendant acted with malice and with reckless disregard for Plaintiff's federally protected right to reasonable accommodations in the workplace.

111. As a result of Defendant's discriminatory conduct, Plaintiff has suffered damages, including lost wages and compensatory damages, and has incurred attorneys' fees and costs.

### Second Cause of Action
### (Americans with Disabilities Act—Disability Discrimination)

112. Plaintiff realleges all prior paragraphs and incorporates them herein.

113. Defendant knew that Plaintiff suffered from disabilities, including: a cardiac

condition, hypertension, diabetes, and sleep apnea.

114. Defendant knew that Plaintiff's disabilities caused difficulties with his cardiovascular, circulatory, endocrine, and breathing major bodily functions.

115. Defendant regarded Plaintiff as having a disability.

116. Defendant knew that Plaintiff had a record of a disability.

117. Defendant terminated Plaintiff's employment on December 21, 2018 because of Plaintiff's disability, because it regarded Plaintiff as having a disability, or because Plaintiff had a record of having a disability.

118. Defendant's acts and omissions violated Plaintiff's rights under the Americans with Disabilities Act.

119. Defendant acted with malice and with reckless disregard for Plaintiff's federally protected right not to be terminated because of his status as a qualified individual with a disability.

120. As a result of Defendant's discriminatory conduct, Plaintiff has suffered damages, including lost wages and compensatory damages, and has incurred attorneys' fees and costs.

### Third Cause of Action
### (Family and Medical Leave Act—Interference)

121. Plaintiff realleges all prior paragraphs and incorporates them herein.

122. Plaintiff worked for Defendants for over one year and worked in excess of 1250 hours in the 12 months prior to his need for leave.

123. Plaintiff suffered from a serious medical condition which required Plaintiff to take leave for treatment and recovery.

124. Plaintiff was entitled to medical leave for the care and treatment of his own serious medical condition.

125. Defendant was on notice of Plaintiff's need for leave.

126. Defendant was required to provide Plaintiff with an appropriate FMLA eligibility notice.

127. Defendant was required to provide Plaintiff with an appropriate FMLA rights and responsibilities notice.

128. Defendant was required to provide Plaintiff with an appropriate FMLA designation notice.

129. Defendant failed to comply with the FMLA Employer Notice Requirements contained in 29 C.F.R. § 825.300 by failing to provide Plaintiff an eligibility notice, a rights and responsibilities notice, and a designation notice.

130. 29 C.F.R. § 825.300(e) states that a, "Failure to follow the notice requirements set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights."

131. 29 U.S.C. § 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.

132. By failing to follow the FMLA Employer Notice Requirements Defendant interfered with, restrained, or otherwise denied Plaintiff the exercise of his FMLA rights.

133. Defendant's failure to comply with the FMLA Employer Notice Requirements caused the termination of Plaintiff's employment by not providing him the notice or information necessary to determine that his absences from work would or would not be counted as FMLA leave.

134. Plaintiff was entitled to reinstatement to his prior position or a substantially equivalent position at the conclusion of his leave.

135. Defendant did not restore Plaintiff to his prior position or a substantially equivalent position.

136. Defendant's actions and omissions violated Plaintiff's rights under 29 U.S.C. § 2615(a).

137. Defendant's actions and omissions were performed willfully and were not done in good faith.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1. A declaration that Defendant discriminated against Plaintiff in violation of the American with Disabilities Act;
2. Backpay in amount equal to lost compensation and benefits;
3. Damages for all other monetary losses sustained as a direct result of the violations;
4. Non-pecuniary and compensatory damages, including damages for humiliation, emotional distress, and consequential damages
5. Reinstatement or front pay in lieu thereof;
6. Liquidated damages;
7. Punitive damages;
8. Nominal damages;
9. Pre- and post- judgment interest at the highest statutory rate;
10. Costs and attorneys fees pursuant to Fed. R. Civ. P. 54 and 29 U.S.C. § 2617; and
11. All other legal or equitable relief the court deems appropriate.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial for all issues triable by jury.

Respectfully submitted this 18th day of November, 2020.

                                        CORNISH & DELL'OLIO, P.C.

                                        s/Ian D. Kalmanowitz
                                        Ian D. Kalmanowitz, # 32379
                                        Cornish & Dell'Olio, P.C.
                                        431 N. Cascade Ave. Suite 1
                                        Colorado Springs, CO 80903
                                        719-475-1204
                                        719-475-1264 (fax)
                                        ikalmanowitz@cornishanddellolio.com
                                        Attorneys for Plaintiff

Plaintiff's address:
1417 Darby Street
Colorado Springs, CO 80907

16